VINCENT F. JUIDITTA, as Administrator of the Estate of BEVERLY A. JUIDITTA, Deceased, Appellant-Respondent, v BETHLEHEM STEEL CORPORATION, Defendant, and SOUTH BUFFALO RAILWAY COMPANY, Respondent-Appellant. (Appeal No. 1.)

VINCENT F. JUIDITTA, as Administrator of the Estate of BEVERLY A. JUIDITTA, Deceased, Respondent-Appellant, v BETHLEHEM STEEL CORPORATION, Defendant, and SOUTH BUFFALO RAILWAY COMPANY, Appellant-Respondent. (Appeal No. 2.)

Fourth Department, May 23, 1980

APPEARANCES OF COUNSEL

*Tenney, Smith & Scott (Eugene C. Tenney* of counsel), for Vincent F. Juiditta.

*Hodgson, Russ, Andrews, Woods & Goodyear (Grover R. James, Jr.,* of counsel), for South Buffalo Railway Company.

## OPINION OF THE COURT

SCHNEPP, J.

Beverly Juiditta, age 33, was killed in the early morning hours of August 8, 1970 when she was struck by a railroad car operated on property and tracks owned by the Pennsylvania

Railroad—a large railroad interchange yard, containing at least 13 tracks. Apparently after she had crossed about 9 tracks, she was struck by a lead car of a string of railroad cars which had been pushed forward northerly on track 4D by an engine and crew of the South Buffalo Railway Company (South Buffalo). The jury rendered a verdict against South Buffalo for $280,000 for Ms. Juiditta's wrongful death and $70,000 for her conscious pain and suffering prior to her death. The trial court granted defendant's motion to set aside the verdict for the wrongful death and directed a new trial of the wrongful death cause of action unless plaintiff stipulated to consent to reduce the verdict to $190,000. Plaintiff so stipulated and the court adjudged the defendant liable for $260,000 ($190,000 + $70,000) plus interest.

On this appeal from the judgment entered by the trial court and from orders denying motions for other relief, South Buffalo claims that (1) plaintiff failed, as a matter of law, to establish a prima facie case of negligence; (2) Ms. Juiditta was guilty of contributory negligence as a matter of law and the jury's decision to the contrary was against the weight of the evidence; (3) no award for conscious pain and suffering was justified, or, in the alternative, the verdict was clearly excessive and should be greatly reduced; and (4) the award for wrongful death, even as reduced, if sustainable at all, was excessive and should be substantially reduced.

The evidence presented at trial reflects the following facts: In the early morning hours of August 8, 1970 Fred Proctor, George Bentley and Alvin Castin, employees of the defendant South Buffalo, left the railroad yard where they were on duty and went to the Berman Inn approximately three miles away. While there, the trio met the deceased, Ms. Juiditta, and Nancy Bartolomeo. Thereafter, Castin, who had driven the three men to the inn, stated that he wanted to talk with Ms. Bartolomeo privately. Ms. Juiditta agreed to drive Proctor and Bentley back to the railroad yard in her car. The group was to meet at a parking lot near the area "L" building at the railroad yard. Castin and Ms. Bartolomeo left the inn first.

When Ms. Juiditta drove back to the railroad yard she followed Proctor's directions and proceeded north along a service road used by the employees of the defendant to go to and from work. As they were traveling on the service road, a Pennsylvania Railroad train pulled into the yard, blocking the service road which led to the parking lot where the group was

to rendezvous. Because Proctor, a yard master, had work to do, he asked Ms. Juiditta to stop the car and let him out at a point on the service road opposite the area "L" building. Proctor and Bentley hurriedly left Ms. Juiditta and walked west across the railroad tracks which ran between the service road and the area "L" building and wound their way through parked freight cars on the tracks. Ms. Juiditta was last seen by Proctor prior to the accident driving north on the service road toward the blocked railroad crossing.

At his office in area "L" building, Proctor commenced some paperwork. Five to 15 minutes later he heard railroad cars moving and a simultaneous scream. Bentley and Proctor left the office and found Ms. Juiditta, severely injured, lying alongside track 4D. Her injuries included extensive lacerations to her right arm and breast; her left leg was almost completely torn off at her thigh. The accident occurred at approximately 3:45 A.M. and she was removed by ambulance at 4:25 A.M. She died at approximately 4:45 A.M. from shock and loss of blood. Evidence at trial tended to prove that she was conscious until the time of her death.

Ms. Juiditta was struck by the front end of the lead car of a string of 21 railroad cars which had been shoved north on track 4D by South Buffalo. These cars which were parked on track 4D blocked access to the adjacent track 3D. Track 3D was needed by South Buffalo to deliver cars from the Bethlehem Steel plant, situated to the south of the interchange yard, to the Pennsylvania Railroad train which was waiting on tracks to the north. After obtaining clearance from a yard master (not Proctor) in area "D" (located south of area "L"), the South Buffalo train of 53 cars traveling north from the Bethlehem Steel plant coupled onto the 21 cars and pushed them north to clear access to track 3D. The 21 cars on track 4D were rolling free after having been pushed by and uncoupled from the South Buffalo train, when they struck Ms. Juiditta. A trainman ("hind-end man"[1]) was riding the lead car of the 53-car train. No trainman was riding the lead car of the 21 cars pushed forward on track 4D. There was conflicting evidence as to whether a horn was sounded by the locomotive prior to moving the cars on track 4D.

Following the accident, Ms. Juiditta's automobile was found

---

1. A "hind-end man" is a trainman who aligns the switches for the intended movement of the train and is usually on the rear end of a line of cars during a pulling movement or on the front end of a shoving movement.

parked alongside the service road, facing south, approximately across from the area "L" office. The car's left rear tire was flat. Proctor, Bentley and Castin, when interviewed shortly following the accident, did not disclose that they had left the railroad premises, and denied any knowledge of the identity of the deceased or reason for her presence in the area. In fact, Proctor testified at trial that he let the air out of the tire on Ms. Juiditta's car so as to obfuscate the purpose of her presence on the service road. It was not until March, 1971 that the activities of Proctor, Bentley and Castin were made known to South Buffalo, following which they were discharged by the company.

At trial, plaintiff offered proof to show that South Buffalo violated its own safety rules and that these violations caused the wrongful death of Ms. Juiditta. In support of this theory plaintiff specifically cited the following two breaches: (1) the failure of South Buffalo to sound a bell or horn before starting to push the cars on track 4D, and (2) the failure of South Buffalo to have a "hind-end man" ride the lead car of the string of 21 cars.[2] On this appeal South Buffalo contends that plaintiff failed, as a matter of law, to establish a prima facie case of negligence.

■ South Buffalo owned and controlled the train which

---

2. The "Safety Rules" for South Buffalo contain the following provisions:

Rule 8.1—"The primary purpose of standard work signals is safety. To avoid accidents, signals must be properly given and strictly observed."

Rule 8.7—"The following are standard locomotive horn signals:

"Note: The signals prescribed are illustrated by 'o' for short sounds; '—' for longer sounds. The sound of a horn should be distinct, with intensity and duration proportionate to the distance signal is to be conveyed.

| SOUND | INDICATION |
|---|---|
| . . . | |
| b. __  __ | Release brakes. Proceed." |

Rule 8.8—"The locomotive bell must be rung when the locomotive is about to move, when moving in area where workmen are on or about the tracks, and when approaching and passing over road crossings."

Rule 18.1—"Ride the side ladder on the leading end of a car whenever possible."

The Safety Rules also contain, *inter alia,* two photographs depicting a "right" and "wrong" method for riding railroad cars. In the picture labeled "wrong", a trainman riding the lead end of a moving car, is not looking in the direction of movement. The text accompanying the two pictures, entitled "Close Clearance Between Yard Tracks", states that the trainman in the "wrong" picture "may be knocked off [the] car to ground [by a car on an adjacent track] resulting in injury". In the picture labeled "right", a trainman is riding the lead car of a moving car but is looking forward in the direction of travel. The text states that this trainman "is riding a car in such a manner as to protect himself from injury and is also in a position to warn others."

caused the death of Ms. Juiditta and it was required to operate this instrumentality in a careful and prudent manner. It owed a duty to use ordinary care against a foreseeable danger. Its liability is governed by the standard applicable to negligence cases generally, i.e., the "standard of reasonable care under the circumstances whereby foreseeability shall be a measure of liability" *(Basso v Miller,* 40 NY2d 233, 241; see, also, *Scurti v City of New York,* 40 NY2d 433). Negligence requires both a foreseeable danger of injury to another and conduct unreasonable in view of the danger. The pivotal issues here are whether South Buffalo owed a duty to Ms. Juiditta and, if it did, whether, in the face of it, South Buffalo failed to act in a reasonably prudent manner. The answers to these questions turn largely on the question of foreseeability. In addressing these issues, the Court of Appeals had this to say in *Havas v Victory Paper Stock Co.* (49 NY2d 381, 385-386): "[I]n a case which raises such traditional negligence law queries * * * the answers are still to be found in the principle so pungently phrased by CARDOZO that '[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation' *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 344). Or, as it is spelled out more precisely in the English case that is the progenitor of the foreseeability principle, '[W]henever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger' *(Heaven v Prender,* 11 QBD 503, 509, Britt, MR [1883])." The question of foreseeability is one for the court when the facts are undisputed and but one inference can be drawn; it is for the jury when varying inferences may be drawn *(Palsgraf v Long Is. R. R. Co.,* 248 NY 339, 345).

The thrust of defendant's argument is that the risk of injury to Ms. Juiditta was not reasonably foreseeable and that "[n]one of the train crew * * * had any knowledge of [Ms. Juiditta's] presence, or any reason to anticipate that she might be in the area, nor any way to determine that she was in the area". South Buffalo contends that Castin, Proctor and Bentley were not acting within the scope of their employment when they left the premises and were returning thereto and

thus, "could not legally extend an invitation to Beverly Juiditta to enter the premises". South Buffalo further argues that notice or knowledge of the presence of Ms. Juiditta on the premsies cannot be imputed to it through these employees who had abandoned their employment and were participating in a private frolic (see *Ford v Grand Union Co.,* 268 NY 243).[3]

Generally, "knowledge possessed or notice received by an agent is chargeable to the principal when not actually communicated only when relevant to matters entrusted to the agent and within his authority so that it is his duty to communicate such knowledge or notice to the principal" (3 NY Jur 2d, Agency and Independent Contractors, § 264). "[K]nowledge acquired by an agent while acting for his principal, if relevant to the scope of his employment, is chargeable to the principal, assuming that the agent is not acting adversely [to his employer's interests] and that there is no duty upon him not to disclose his knowledge" (3 NY Jur 2d, Agency and Independent Contractors, § 265).

Proctor, Bentley and Castin were apparently acting outside the scope of their employment and adversely to South Buffalo's interests during the time in question. The trio's jaunt to the Berman Inn exceeded the time period allotted to railway employees for lunch and violated the instructions of their supervisors. While at the inn, the men consumed alcoholic beverages, a practice expressly prohibited by South Buffalo's safety rules.[4] For these acts, Proctor, Bentley and Castin could be disciplined; thus, it was against their interests to disclose the nature of their exploits. When the men requested that Ms. Juiditta enter the railway's property they did this to accommodate their personal needs for transportation. Accordingly (and most logically), they would not inform South Buffalo of Ms. Juiditta' presence, because it might reveal their misdeeds. Proctor's testimony that he disabled Ms. Juiditta's car underscores their resolve to maintain secrecy. The fact that South Buffalo did not learn the purpose of Ms. Juiditta's presence until long after the accident evinces the effectiveness of their

3. The court charged, without exception by South Buffalo, that if the jury found these claims to be "the facts", South Buffalo "is not responsible for the acts of [these] employees, including bringing Mrs. Juiditta on South Buffalo Railway Company property and is not chargeable with knowledge of her presence there simply because such employees had such knowledge".

4. Rule 1.4 of South Buffalo's safety rules provides: "The use of intoxicants or narcotics by employees subject to duty, or their possession or use while on duty, is strictly prohibited".

"silence". Arguably, South Buffalo should not be charged with the knowledge of these employees.

Yet, there are other relevant factors, disclosed by the proof, related to the issue of foreseeability. Photographic exhibits in evidence establish that at the entrance to the service road used by Ms. Juiditta on August 8, 1970 a sign stating "PRIVATE PROPERTY—NO TRESPASSING" was posted. The service road is wide (easily accommodating two lanes of traffic) and although it is not paved, it appears to be well maintained. There was proof that the road intersects with Lake Avenue, a well-traveled public highway serving a populated area. The service road is accessible to the public; no guard, gate or barrier obstructs passage on the road. There is also proof that the road is owned by South Buffalo and used by its employees going to and from work. The existence of a parking lot adjacent to the yard office at area "L" evinces the road's regular use. Also, the record reflects that the service road at various points runs close to the railroad tracks in the interchange yard and that there is no embankment or fence between the road and the tracks. Nothing exists to denote the presence of danger to those unfamiliar with the area.

The sign warning against trespassing evinces that South Buffalo anticipated that persons, other than employees, would use the service road for access to the interchange yard—an area where they (unwittingly) might place themselves in danger. South Buffalo was aware of the proximity between the railroad tracks and the service road. Yet, there is nothing to prevent nonemployees who are not "trespassing" from entering the interchange area via this service road. "A trespasser is one who goes upon the premises of another without invitation, expressed or implied, and does so out of curiosity or for his own purposes or convenience, and not for the performance of any duty to such owner" (61 NY Jur, Trespass, § 1). Ms. Juiditta, a nonemployee, was not a trespasser. She entered the premises not for her own purposes but for the purpose of transporting South Buffalo employees at their invitation to their place of work. Thus, the no trespassing sign did not bar her entrance; it did not constitute a warning that the road was "off limits" to her. There was no sign on this road giving her notice that only South Buffalo employees could enter the property. It is of no moment that Proctor and Bently may not have had actual authority to invite Ms. Juiditta on railroad property. They possessed apparent authority to grant permis-

sion to enter and no sign on the service road would cause Ms. Juiditta to question the validity of their authority (see, generally, Restatement, Agency 2d, § 8). Ms. Juiditta's status as a nontrespasser, the accessibility of the service road, and the proximity of the road to the railroad tracks all have a direct bearing on the foreseeability of her presence on the railway's property.

Moreover, the adoption by South Buffalo of its safety rules has probative value and relevance in determining whether, under all of the facts and circumstances, injury to someone was foreseeable upon a violation of the rules. It is apparent that the rules were designed to prevent this type of accident. For example, there would be no need for a rule requiring that a locomotive horn be blown unless it was within the ambit of apprehension that someone would be on or near the railroad tracks and be warned thereby of the approach of a train. Lack of knowledge, in fact, of someone's presence on the tracks would not excuse South Buffalo from observing its own rules.

As we have previously noted the question of foreseeability is one for the jury when varying inferences can be drawn from the facts (Palsgraf v Long Is. R. R. Co., 248 NY 339, 345, supra). In view of the varying inferences that can be drawn from the trial proof, the jury could well find that the risk of injury to Ms. Juiditta was reasonably foreseeable by South Buffalo (see Prosser, Torts [4th ed], § 37). Her presence was not so improbable as to be unforeseeable as a matter of law. The court should be hesitant to take the case from the jury where reasonable people could well differ on whether the incident was foreseeable.

Next, we turn to and consider the issue of whether there is a sufficient proof in this record to establish that South Buffalo was negligent. Although South Buffalo must conduct dangerous activities in the course of its business operations, it is required to take reasonable measures to prevent injury to those whose presence can be reasonably foreseen on its premises. The theory on which the case was tried was that South Buffalo had violated its own safety rules (set forth above). South Buffalo argues that its safety rules cited by plaintiff are irrelevant and, in any event, were not violated. Plaintiff presented proof from which the jury could have inferred that defendant failed to sound a horn before moving the cars "out foul" on track 4D. Although the train's engineer testified that it is standard procedure for him to blow a "whistle" before

moving a train, Proctor and another South Buffalo employee testified that prior to the movement of the cars on track 4D they did not hear the sound of the locomotive's horn. Both witnesses confirmed that you could hear the sound of a train's horn for quite a distance—"a mile, maybe two miles". The record reflects that the train of 74 cars (53 cars + 21 cars) was less than a mile long. Thus, it is apparent that the sound of the locomotive's horn could be heard the length of a 74-car train. The applicability of defendant's safety rules concerning the sounding of a horn and the consequences of defendant's alleged failure to sound the horn are questions of fact for the jury.[5]

Likewise, whether the absence of a trainman riding the lead car of the string of 21 cars that struck Ms. Juiditta was in violation of the defendant's own safety rules and constituted negligence was a question for the jury. Arguably, the safety rule upon which plaintiff relies does not require that a trainman must ride the lead car of a moving train and look forward so as to be in a position to warn others. But we need not speculate as to the intended meanings of the rule. Under the circumstances as shown by the record, questions as to what purpose the safety rules were to serve, and what meaning should be ascribed to the rules are also questions of fact for the jury. A violation of the rules is not negligence per se (see *Martin v Herzog,* 228 NY 164) but may be regarded by the trier of the facts as some evidence of negligence *(Danbois v New York Cent. R. R. Co.,* 12 NY2d 234, 239; Admissibility in evidence of rules of defendant in action for negligence, Ann. 50 ALR2d 16). It is the jury's province to find that violation of the rule fell below the standard of reasonable care.

■■ In a wrongful death action the plaintiff is not held to as high a degree of proof as plaintiffs in personal injury actions *(Noseworthy v City of New York,* 298 NY 76) and is entitled to the benefit of every favorable inference which can be reasonably drawn from the evidence in determining whether a prima facie case has been made *(Carpino v Baker,* 66 AD2d 201, 205; *Lattimore v Falcone,* 35 AD2d 1069). Where

---

**5.** The weight of the evidence establishes that South Buffalo's alleged failure to ring the locomotive's bell prior to moving on track 4D was not the proximate cause of the accident. Unrebutted testimony shows that a locomotive's bell cannot be heard for more than 10 to 15 cars away and that Ms. Juiditta would not have been able to hear the sound of the bell from a distance of 74 cars.

reasonable minds may differ concerning legitimate inferences to be deduced from the evidence, it is for the jury to draw these inferences *(Archie v Todd Shipyards Corp.,* 65 AD2d 699, 700; *Goldberg v Springer,* 61 AD2d 806, 807). Proof of defendant's negligence may be established by circumstantial as well as by direct evidence *(Archie v Todd Shipyards Corp.,* 65 AD2d 699, 700, *supra).* The plaintiff need not point to the precise causes of his damages to establish liability. He need only show facts and conditions from which negligence may be reasonably and legitimately inferred *(White v Lehigh Val. R. R. Co.,* 220 NY 131, 136; *Archie v Todd Shipyards Corp., supra,* p 700). We hold that plaintiff has made out a prima facie case of negligence which was properly submitted to the jury. "Plaintiff['s] evidence is deemed sufficient to make out a prima facie case if it shows facts and conditions from which the negligence of the defendant * * * may be reasonably inferred" *(Wragge v Lizza Asphalt Constr. Co.,* 17 NY2d 313, 320; *Lattimore v Falcone,* 35 AD2d 1069, *supra).*

■ ■ The defendant's contention that Ms. Juiditta was guilty of contributory negligence as a matter of law and that the jury's decision to the contrary was against the weight of the evidence is without merit. The issue of contributory negligence is almost always a question of fact for the jury *(MacDowall v Koehring Basic Constr. Equip.,* 49 NY2d 824; *Wartels v County Asphalt,* 29 NY2d 372, 379; *Rossman v La Grega,* 28 NY2d 300, 306; *Carpino v Baker,* 75 AD2d 540; *Jackson v Livingston Country Club,* 55 AD2d 1045). If any possible hypothesis based on the evidence forbids the imputation of fault to the deceased, as a matter of law, the question is for the jury *(Cruz v Long Is. R. R. Co.,* 28 AD2d 282, 285).

There are many reasonable interpretations of the facts where one could find Ms. Juiditta free of contributory negligence. She could have been lost and confused, or perhaps ill. She may also have had car trouble and crossed the tracks in search of assistance. It is also possible that she was attempting to rendezvous with her friend, Ms. Bartolomeo, at the parking lot near Building "L", as she had previously planned. All these are possible interpretations. The fact that she saw Proctor and Bentley exit her car and cross the railroad tracks in front of Building "L"—minutes before she would attempt the same route, bears on the reasonableness of her action in crossing the railroad tracks. In any event, there are sufficient

facts which support the jury's finding that Ms. Juiditta was free of contributory negligence.[6]

■ Lastly, we address South Buffalo's contentions that the verdicts for conscious pain and suffering and wrongful death were excessive. If a verdict is insufficient or excessive to such an extent as to indicate that it resulted from sympathy, passion, prejudice or corruption, this court may set it aside or order that the judgment be reversed unless the parties stipulate to an increase or decrease. However, "[t]o avoid usurping the function of the jury, th[is] power should be used only if the verdict is so disproportionate to the injury as to not be within reasonable bounds" (*Riddle v Memorial Hosp.*, 43 AD2d 750, 751; see, also, *McAllister v Adam Packing Corp.*, 66 AD2d 975, 976). A jury's assessment of damages should not be disturbed unless it is so excessive or inadequate that it shocks the conscience of the court (*Petosa v City of New York*, 63 AD2d 1016, 1017; *Welty v Brown*, 57 AD2d 1000, 1001). Each case must be assessed on its own peculiar facts and circumstances.

■ In determining damages for conscious pain and suffering experienced in the interval between injury and death, when the interval is relatively short, the degree of consciousness, severity of pain, apprehension of impending death along with duration are all elements to be considered (*Tenczar v Milligan*, 47 AD2d 773, 775; *Cook v Erwin*, 30 AD2d 579). There was proof that the deceased was left lying on the railroad track after she was struck by the railroad car until approximately 4:25 A.M. (or around forty minutes); that the deceased screamed; that after Ms. Juiditta was struck she was alive, and was bleeding profusely as she lay along the tracks; that a railroad employee tried to stop the bleeding by applying a tourniquet; and that she was making noises and breathing sounds. There was also proof that when asked her name, she responded, "Beverly". Nothing in this record reflects that the jury's verdict of $70,000 for conscious pain and suffering was so disproportionate to the injury as to not be within reasonable bounds (*Riddle v Memorial Hosp.*, supra; see, also, *McAllister v Adam Packing Corp.*, supra).

---

**6.** South Buffalo did not own the land and tracks where the incident occurred and thus section 83 of the Railroad Law apparently has no application (cf. *Merriman v Baker*, 34 NY2d 330). South Buffalo did not raise the question of the statute's applicability either before the trial court or on this appeal. Further, the record is silent as to the relationship between South Buffalo and the Pennsylvania Railroad Company and the exact location of the South Buffalo railroad tracks in the area.

■ The jury's verdict for Ms. Juiditta's wrongful death totaled $280,000, including $100,000 to recompense Ms. Juiditta's children for the loss of their mother and $180,000 for lost wages. The loss of care, love and guidance that a mother provides for her children are proper elements of pecuniary damages in a wrongful death action *(Tilly v Hudson Riv. R. R. Co.,* 29 NY 252; *Richardson v Lutheran Hosp. of Brooklyn,* 70 AD2d 933; *Didocha v State of New York,* 54 AD2d 786; see, generally, 2:320; 1 NY PJI2d 683 *et seq.).* The record establishes that the amount of damages which the jury found to recompense the children for the loss of the care, love and guidance of their mother's love is not excessive (see *Ramos v City of New York,* 56 AD2d 763, 764). However, the trial court acted properly in reducing the $180,000 "lost wages" item, which was not supported by the record, to $90,000.

Accordingly, the judgment of Supreme Court should be affirmed.

SIMONS, J. P., HANCOCK, JR., DOERR and MOULE, JJ., concur.

Appeal No. 1.—Order unanimously affirmed.

Appeal No. 2.—Judgment unanimously affirmed, with costs to plaintiff.