SHU–TAO LIN, as Administrator of the Goods, Chattels and Credits which were of Shu-Ren Lin, M.D., Deceased, Plaintiff,

v.

McDONNELL DOUGLAS CORPORATION and American Airlines, Inc., Defendants.

No. 79 Civ. 3195 (RWS).

United States District Court, S.D. New York.

Sept. 28, 1983.

F. Lee Bailey and Aaron J. Broder, New York City, for plaintiff; Aaron J. Broder, Howard Fifer, New York City, of counsel.

Mendes & Mount, New York City, for defendant McDonnell Douglas Corp.; Kevin F. Cook, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant American Airlines, Inc.; Randal R. Craft, Jr., Peter Hoenig, Lawrence M. Harnett, New York City, of counsel.

## OPINION

SWEET, District Judge.

Defendants McDonnell Douglas Corporation ("McDonnell") and American Airlines, Inc. ("American") have moved pursuant to Rule 59 Fed.R.Civ.P. to set aside the jury verdict awarding damages of $7,000,000 for pecuniary loss and $10,000 for pain and suffering arising out of the wrongful death of Shu-Ren Lin, M.D. ("Dr. Lin"), in the Chicago crash of an American McDonnell DC-10 on May 25, 1979. The action was brought by Shu-Tao H. Lin ("Lin"), his administrator on behalf of the estate and Dr. Lin's survivors, his wife and four children. For the reasons set forth below, the motion is granted because the parties did not receive a fair trial and because the verdict was excessive, as a consequence of which the action will be retried in the fall

of 1983 unless plaintiff agrees to a remittitur in the amount of $4,274,500 dollars. The court denies, for the reasons given below, defendants' motion for judgment notwithstanding the verdict on the issue of conscious pain and suffering.

### Prior Proceedings

The parties are, of course, completely familiar with the history of this action—its initiation on June 19, 1979, its transfer on August 13, 1979 to the Northern District of Illinois for coordinated and consolidated pretrial proceedings, its return to this district on November 18, 1982 for trial on the issues of damages, the parties having entered a no contest stipulation on the issue of liability, and the trial which commenced on April 1, 1983 and terminated on May 6, 1983 with a verdict for the plaintiff, the defendants having introduced no evidence.

Because of errors committed during the trial with respect to the admission of evidence, principally certain expert testimony, the inadequacies of the pretrial discovery, and unforeseen prejudicial events, American and McDonnell did not receive a fair trial. Also as a result, the verdict of the jury was excessive, and a remittitur would be appropriate. If the proposed remittitur is unacceptable, retrial will be had in accordance with the procedures described below.

### Fair Trial

#### A. Errors Concerning Expert Testimony

The core issue to be tried was the loss of income which could properly be attributed to Dr. Lin's wrongful death. At the time of his death, Dr. Lin was a tenured Associate Professor at the University of Rochester ("University") in the radiology department, and a neuroradiologist qualified in the use of the highly-specialized Computerized Axial Tomography ("CAT") scan, in which a series of x-rays are taken on various planes and the results are computerized to produce, in effect three-dimensional analysis. Dr. Lin had written in this field and was an acknowledged expert. At the time of his death, a book on neuroradiology

which Dr. Lin co-authored with Dr. Kyuh-wan Francis Lee was about to be published.

Dr. Lin's earnings at the University ranged from $38,000 in 1974 to $56,000 in 1978. In 1979, the year of his death, Dr. Lin earned approximately $40,000 in salary from the University and received certain other payments from the University. The nature of these additional payments was not explained by any witness with personal knowledge though they were reported as part of the fiduciary return for 1979. The testimony also revealed that in addition to his home in Rochester, Dr. Lin had invested in real property in Maryland and Florida, though the property had generated no income. He had also invested in Earl's Liquor Store in Fairport, New York, a neighboring community, and in 1979 the liquor store had returned a small profit.

Upon this factual base, the plaintiff's expert economist, Dr. Edmund Mantell, estimated that the income lost by Mrs. Lin and her four children because of Dr. Lin's death had a present discounted value of $41 million, the estimated income for the last year of Dr. Lin's projected working life being $9.8 million. The key to this computation was Dr. Mantell's assumption that Dr. Lin's income would have increased by 25% per year for the first four years after his death, and by slowly declining percentages in later years. Dr. Mantell derived the 25% figure by computing the compound average rate of growth of Dr. Lin's earnings from 1971 to 1979. The figure Dr. Mantell used for 1979 was $125,000, an extrapolation from Dr. Lin's actual earnings during the almost five months of that year during which Dr. Lin was alive. The figure was a substantial rise from Dr. Lin's 1978 reported earnings of $56,000.

■ Dr. Mantell was qualified to make computer projections and to testify. However, those projections require a stronger basis than the simple arithmetic computations he employed. Although the extrapolation for 1979 appears to have relied on non-salary payments from the University to Dr. Lin, plaintiff brought in no witness with personal knowledge to testify as to the nature of these non-salary earnings, or as to Dr. Lin's salary at the time of his death. The computation was based only on unclear tax records. For these reasons, the straight line extrapolation for 1979 was without foundation. Similarly, there was no basis, stated or implied, that justified the assumption of annual income increases of 25% or slightly lower for many years. No studies, empirical data, or comparison with other university salary structures were offered to justify this projection.

These gross income estimates were then reduced by a federal tax rate of 13%, which had been Dr. Lin's average effective tax rate in the years before his death. No foundation was established for the use of such a rate, which was based on a period when Dr. Lin had a lower income and more deductions for dependents than he would have had in the years to come. By using this constant 13% figure, Dr. Mantell implicitly states, for example, that the effective tax rate on Dr. Lin's 1978 income of $56,000 and that on his projected income in 2007 of $9.8 million would be identical. No standardized tables, accepted formulae or other evidence were employed to justify this constant rate.

The resulting post-tax figure was further reduced by estimates of what would have been Dr. Lin's personal consumption. The estimates were based on studies published by the United States Bureau of Labor Statistics and other books and articles. Dr. Mantell testified that he did not include estimates of state taxes and fringe benefits because the two were mutually off-setting. He testified that he considered 10% to be the appropriate rate for state taxes on earned income and that he had conducted research on, and was aware of, fringe benefit packages which led him to the conclusion that a fringe benefit package for a university such as the University of Rochester would approximate 12 to 14% of earnings.

Present value discounting of the stream of Dr. Lin's lost earnings was omitted on the premise that inflation over the lifetime of Dr. Lin would offset it. Dr. Mantell's

calculations are thus based on the unlikely assumption that the real rate of return on investments in the United States will be zero for the next 25 years. No empirical, research or other testimonial basis was offered to justify this assumption. *See Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 34–40 (2d Cir.1980) (suggesting 2% as a minimum inflation-adjusted discount rate), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981); *Shatkin v. McDonnell Douglas Corporation and American Airlines, Inc.,* 565 F.Supp. 93 at 96 (S.D.N.Y.1983) (questioning whether expert estimate of 0.11% real rate of interest was made in good faith).

Finally, the resulting figure was increased to compensate for an assumed 50% tax rate on the income to Mrs. Lin resulting from the damage award. Dr. Mantell selected this figure arbitrarily without any empirical or research basis, merely referring nominal tax rates in prior years. This unsupported assumption can be viewed as no more than conjecture.

■ During the trial, a 4-foot by 1½ foot chart with a dollar amount opposite each year of Dr. Lin's projected work life was placed before the jury. These values, large in amount, were said to be simply part of Dr. Mantell's computer calculation, lacking any probative value in themselves. Because the calculations were devoid of probative value, it was error to have them before the jury.

A further problem with Dr. Mantell's testimony was its internal inconsistency. Since the completion of testimony in this case, the Honorable Milton Pollack has filed a memorandum opinion in *Shatkin v. McDonnell Douglas Corporation and American Airlines, Inc., supra,* an action arising out of the crash here at issue. Judge Pollack barred Dr. Mantell's testimony with respect to plaintiff's lost earnings as based upon conjecture and inconsistent with the record, stating:

An expert may not rely principally on inconsistent assumptions that are biased toward the party for whom the expert testifies. The tax rate assumptions are one example of such blatantly contradictory assumptions.

At 96. Here, of course, the 13% tax rate Dr. Mantell assumed for income to Dr. Lin and the 50% tax rate assumed for income to Mrs. Lin from investment of the award are contradictory. Dr. Mantell explained the contradiction only by saying that Dr. Lin had the "incentive and the ability" to reduce his taxes.

■ In *Shatkin, supra,* after an offer of proof out of the presence of the jury, Judge Pollack found that Dr. Mantell's unsupported, inconsistent assumptions and testimony would contain problems similar to those in the case at hand, and thus excluded Dr. Mantell's testimony, stating:

The Court finds that Dr. Mantell's assumptions and techniques of calculation involve egregious and gross error at almost every step. The testimony is not competent, has no evidentiary value and no reasonable juror would be justified in relying on or according any weight to it whatsoever. To permit the jury to hear it would amount to irretrievable prejudicial projections of an unfounded character and hopelessly prejudice the fairness of the trial.

At 94. Here also testimony was taken outside of the jury's hearing. The subsequent ruling of admissibility is now reversed on the full record for the reasons stated.

■ One basis for excluding expert testimony thus flawed is Rule 703 of the Federal Rules of Evidence. While the second sentence of that rule authorizes the admission of certain expert testimony, it also contains a limitation. It requires that the facts or data relied on by an expert be "of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject." Where the grounds for expert testimony are not reasonably reliable, the court may exclude the testimony under this Rule. *See Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977) (Wright, J.); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1313, 1330 (E.D.Penn.

1980). Dr. Mantell's testimony in this case fell into this category and thus should have been excluded. The same result could also have been reached via Rule 403, which permits the exclusion of evidence the probative value of which "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." *See Shatkin*, at 96; *Zenith*, 505 F.Supp. at 1326 n. 12. In this case, the obviously low probative value of Dr. Mantell's testimony was far outweighed by the prejudicial and misleading effect of the large numbers produced by his computer program.

■ Although members of his family testified that Dr. Lin had discussed entering private practice and that the trip to Japan on which he was embarked at the time of his death was to be followed by a visit to Taiwan, his birthplace, in order to arrange for capital to be invested in his private practice, the jury, in its special verdict, determined that Lin had failed to prove that Dr. Lin would have entered private practice. Therefore, for the purposes of this motion, I need not reach the issue of the admissibility of the testimony of Oliver Wiley, the expert offered by Lin on the subject of earnings achievable by neuroradiologists in private practice, who use CAT scans and other recently developed diagnostic techniques. However, Mr. Wiley did not provide any empirical data to support his estimates of extremely high earnings. He relied only on "feasibility studies", citing no studies or records of the actual net earnings of neuroradiologists in private practice. As a result, I now conclude it was prejudicial error within the meaning of Rule 403 to permit Wiley to testify as to his predictions, despite their acceptability for feasibility study purposes.

### B. Inadequate Pretrial Discovery

■ A separate reason defendants did not receive a fair trial was that Dr. Mantell's computer methodology and data were not adequately disclosed during pretrial discovery, and defendants did not have sufficient opportunity to discover and prepare to defend against Dr. Mantell's changed theories of damage calculation. A brief procedural history of the case has already been set forth. Initially, it was assumed that as stated in the transfer orders, pretrial discovery had been completed. In the course of pretrial conferences and motions, it became clear that the discovery on damages was incomplete. The parties set about discovery with vigor and under the pressure of a court-imposed deadline. The record of the pretrial disputes demonstrates conclusively that both sides sought to hold back information until the last moment. Computer calculations by Dr. Mantell were "fine-tuned," discovery was conducted during trial, including both third-party and expert-witness depositions. In an effort to dispose of an aged action, the court pressed forward over the objections, principally from the defendants on the grounds of incomplete discovery. Dr. Mantell's deposition upon his new theories of damage calculations, for example, was taken during trial.

The preferred procedure for testimony concerning computer calculations is set forth in the Federal Manual for Complex Litigation, § 2.714. "Computer inputs and outputs, the underlying data, and the program method employed should be made available to the opposing party in advance of trial as a condition of admissibility." Similarly, Judge Weinstein's treatise on evidence states:

> Some courts have wisely held that not only the results but also the mass of data summarized therein must be made available before trial to opposing counsel. Sufficient information must be made available to opposing counsel so that he can intelligently question the accuracy of the results by cross-examination and rebuttal.

5 J. Weinstein & M. Berger, *Weinstein's Evidence*, 901–106, ¶ 901(b)(9)[01] (1982). In the case at hand, defendants claim to have been unable as a consequence of time pressure to discover the nature of Dr. Mantell's computer program or the underlying data, the inputs and outputs employed in the program. As a result, defendants assert that they "did not have an adequate basis on which to cross-examine plaintiff's

experts." *Perma Research & Development Co. v. Singer Co.*, 542 F.2d 111, 115 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976).

It is, of course, virtually impossible to determine whether the surprise now claimed by American and McDonnell was genuinely prejudicial. There is, however, no doubt that a pretrial conference and a final cut-off for exhibits and discovery would have clarified many of the issues here discussed. Additionally discovery might have given greater validity to the private practice projections of the plaintiff. *See Weiss v. Chrysler Motors Corp.,* 515 F.2d 449, 454–57 (2d Cir.1975).

*C. Emotional Prejudice*

A final unfortunate episode deprived American and McDonnell of a fair trial. After the emotional testimony of Barbara Mueller, the eyewitness to the crash, the trial was recessed for lunch. Just after the trial was recessed, Mrs. Mueller and Mrs. Lin found each other in the public corridor outside the courtroom. Both were in tears, sharing the sorrow of the crash, when the jury emerged from the nearby courtroom exit to see their commonly held, deeply felt grief. The event was spontaneous, unavoidable, and all the more prejudicial because it took place in a close personal environment.[1] There were, of course, emotional displays by Dr. Lin's children and his widow which were also unavoidable but within the control of the court.[2]

*D. Special Verdict Form*

As described below, the elements going into the damage calculation were difficult to assess and should have been separately stated. The lumping together of the various considerations make an analysis of the propriety of the verdict virtually impossible.

*Excessive Verdict*

■ Given the nature of the case, the obvious talents of Dr. Lin and the difficulty of determining the factors that went into the damage calculation, it is now apparent that a more detailed special verdict form was necessary. Some of the difficulties of the loss of support calculation, derived in major part from a lost income, have already been described. Other elements of the monetary damages are the monetary value of the Lin children's loss of Dr. Lin's nurture, care and guidance and the loss of inheritance attributable to any particular skills or abilities of Dr. Lin. A separate finding with respect to these items by the jury might have permitted a portion of this verdict to stand. As it is now, the verdict awards the Lin family an amount which would generate approximately $700,000 each year if invested in tax-free securities, even if the Lins did not touch the $7 million principal. By contrast, in 1978, the last full year of Dr. Lin's life, Dr. Lin earned only $56,000 and part of this sum was spent on Dr. Lin's personal consumption. The award, which provides each family member with more than $1.0 million, must be viewed as excessive in its entirety.

The jury found that the plaintiff had failed to establish that Dr. Lin would have entered private practice. On this assumption, the calculation described below indicates that Dr. Lin's lost earnings, after present discountings, would not have exceeded $3.9 million.

■ In addition, there are two other elements even more difficult to assess, namely, the loss to his estate resulting from the loss of the particular expertise he would have brought to his investments, and the monetary value of the loss to the children of Dr. Lin's nurture, care and guidance. In

---

**1.** No prior incident of this nature had occurred to this court in the use of this courtroom, 302, which has an unfortunate corridor arrangement which results in all trial participants, including the court, emerging in the public corridor at the same time. After the incident the spectators, witnesses, parties, counsel and the public, were asked to remain in the courtroom until the jury had departed.

**2.** Young Andrew's sprint toward his mother in the well of the court after her testimony was spontaneous and took place as the jury was exiting. It was not overly prejudicial, involving, as it did simply a child's desire to be held by his mother, an issue not in contention. The conversation between Andrew and a subsequently discharged juror was something else.

my view, there was insufficient evidence to establish that Dr. Lin's personal efforts would have increased his estate beyond the average rate of return on investments. The only evidence upon which such a conclusion could be based is the testimony concerning the management of Earl's Liquor Store, which in a period of three years turned from an operation with slight losses to one returning a slight profit. Although there was evidence that Dr. Lin applied himself to the operation, the testimony failed to establish that it was his application or expertise that produced the slight turn-around or to indicate that it would continue in the future other than the simple arithmetic projections. To attribute such a result to Dr. Lin and to quantify it would be to speculate without an adequate factual basis.

Other than the testimony of the children, there was no evidence of the financial value of Dr. Lin's nurture, care and guidance. He was without question a supportive, intelligent and helpful parent, one who instilled in his children his own tradition of hard work, application, discipline and the joy of accomplishment through the maximum exercise of one's talents. The children appear to have benefitted since they reflect these qualities, having achieved excellent academic records and having acquired a number of talents ranging from playing the violin to skiing, to say nothing of becoming fluent in a number of languages and comfortable in two cultures.

To quantify in financial terms the loss of a father in the absence of any evidence is, of course, to speculate. To equate a father's role to that of a highly trained professional, such as a psychiatrist, is to distort both roles, and yet clearly such assistance is one way to seek to compensate for the loss of nurture, care and guidance loss suffered by the children. Allowing in the absence of proof that $100 per hour is a reasonable rate for such services, that twice per week would be a reasonable schedule of treatment and that such treatment would be helpful over a ten-year period, perhaps less for the older children and more for the younger, an award of $100,-000 to each child, or $400,000 total, would

not have been unreasonable. Adding this sum to my estimate for loss of support and excluding an award for Dr. Lin's conscious pain and suffering, an award of $4,274,500 is appropriate on the evidence presented to me, as described below.

Of course, the jury awarded $7 million, and it cannot be said that the approximately $2.7 million difference between what the court considers appropriate on this record and the award is simply hairsplitting. $2.7 million itself, under certain circumstances, has been considered excessive. *See, e.g., Dullard v. Berkeley Associates Co.,* 606 F.2d 890 (2d Cir.1979); *Red Star Towing & Transportation Co. v. "Ming Giant",* 552 F.Supp. 367 (S.D.N.Y.1982).

Finally, with respect to a determination of an appropriate award, the record does contain the defendants' rejected pretrial offer to settle pursuant to S.D.N.Y. Civ. R. 30 and Fed.R.Civ.P. 68 for $2.4 million. Such an offer is in the record and certainly is appropriate to consider in this context. Given all the factors set forth above, most particularly the prejudice suffered by the defendants, the verdict was excessive and not supported by the evidence. *See Dellaripa v. New York, New Haven & Hartford Railroad Co.,* 257 F.2d 733 (2d Cir.1958).

*Remittitur*

When, as has happened here, a jury has awarded excessive damages because of prejudicial trial errors, the court may require the plaintiff to choose between a new trial, and acceptance of a reduced award. *Lanfranconi v. Tidewater Oil Co.,* 376 F.2d 91, 96–97 (2d Cir.), *cert. denied,* 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967); *Red Star Towing,* 552 F.Supp. at 377. The practice of allowing plaintiffs to choose between the expense, delay and uncertain result of a new trial and an immediate remittitur goes back to Justice Story's 1822 Circuit Court decision in *Blunt v. Little,* 3 F.Cas. 760 (No. 1578) (C.C.A.Mass. 1822). *See* Note, *Remittitur Practice in the Federal Courts,* 76 Colum.L.Rev. 299 (1976). Such a choice is appropriate here.

In deciding on a remittitur amount, the court has attempted to use the approach employed by the Court of Appeals of this Circuit in *Lanfranconi, supra,* and determine the amount that a properly functioning jury—one not misled by the prejudicial evidence presented in this trial—would have awarded. On the facts before the jury, $4,274,500 million would be an appropriate remittitur. The basis for this determination is set forth below.

*1. Span of Working Life* Dr. Lin was an active sportsman, a runner of accomplishment, and possessed good health. Although he was a diabetic, there was no indication of difficulty controlling the diabetes and no evidence was presented upon which one could infer a shortened life span. Were I the fact finder, I would have concluded that Dr. Lin could be expected to live and work until age 75 and, for the purpose of computing the remittitur, I have therefore projected his income on that basis.

2. *Income* I have assumed that Dr. Lin's income would have been $100,000 in 1979, the year of his death, by extrapolating from his earnings for the part of 1979 during which he was alive. Although the explanation for the excess over his substantially lower salary is murky, off-salary services and accrued benefits may explain the difference, and I have drawn inferences in favor of the plaintiff in this regard. In projecting Dr. Lin's income into the future, I have used as a guideline the earnings of Dr. Lee, who was, like Dr. Lin, a well-regarded professor of neuroradiology with outside activities. Dr. Lee testified that he was earning about $200,000 per year. Since Dr. Lee had entered medical practice ten years before Dr. Lin did, I have assumed that Dr. Lin would have reached an annual salary of $200,000 ten years later than Dr. Lee did. Thus, I have assumed that in 1993, ten years from now, Dr. Lin would have been earning $200,000.

Using these two salaries as bench marks, I computed the compound average annual growth rate that would have produced a rise in salary from $100,000 in 1979 to $200,000 in 1993. This compound average annual rate of growth was approximately five percent. Using this rate of growth, I interpolated a projected salary for each year from 1979 to 1993.

In 1993, Dr. Lin would have been 57 years old. I have assumed that his income would have remained steady until he reached age 65. After this age, I have assumed that his income would decline by 2.5% each year until he ceased working after age 75. On this basis, I have computed a projected annual income for Dr. Lin for each year until 2011, when he would have been 75 years old.

*3. Adjustments to Income* Each year's projected income must be reduced by Dr. Lin's expected personal expenditures. Using standard tables, Dr. Mantell calculated these as 10% of income. I have used this figure.

Projected income would also be reduced by the effective tax rate Dr. Lin would have paid on his income. However, the Lin family can be expected to pay taxes at the same rate on income from the award. Since the award would have to be increased to compensate for the latter, the two rates offset each other.

*4. Present Discounting* As a matter of both law and fact, I have concluded that the approach set forth in *Doca,* 634 F.2d at 34–40, by the Honorable John Newman is appropriate here. *Doca* described two methods to adjust for inflation and interest. Since the methods yield identical results, I have used the second method, which is more convenient here. Under that method, earnings are projected without compensation for inflation, as has been done here. Next, personal consumption is deducted. An inflation-adjusted discount rate is then calculated. *Doca* notes evidence that this rate is relatively constant and suggests 2% as a fair estimate of the historic rate. I have concluded that this rate is appropriate here. Finally, this rate is used to discount each year's expected income to the present. Using these steps the present value of the loss of Dr. Lin's support is $3,864,000, to which must be added an amount to compensate for the loss of nurture, care and guidance as set forth above. Hence I conclude that a remittitur of $4,274,500, including

the award for Dr. Lin's pain and suffering [3] is appropriate.

If Lin agrees to this remittitur, a retrial will not be necessary. If Lin rejects the remittitur, the parties will proceed to a retrial in the Southern District of New York. In the latter event, certain matters raised by American and McDonnell require disposition. Most significant of these is the question of the pretrial order and the completion of discovery. Within three weeks of the filing of this order, the parties will exchange drafts of the pretrial order, including the list of proposed exhibits and witnesses, including experts. Within three weeks thereafter, any depositions of named witnesses shall be completed and final drafts of the pretrial order exchanged. Within a week thereafter, a pretrial conference will be held to settle the pretrial order. No testimony of a witness nor any exhibits will be admitted unless set forth in the pretrial order.

The rulings with respect to the geneology and photographs remain unchanged, except that the photographs will be reduced in number. Without additional evidence, no testimony with respect to estate evaluation will be permitted. There will be no reference to love by counsel or witnesses. The ruling with respect to the obituary notice remains unchanged. The school records will be admitted, accompanied by an instruction that the later records are inadmissible as a matter of law. No evidence will remain in the courtroom except that which has been described in the pretrial order unless later permission is granted by the court—in short, no Wiley boxes.

During the summations, no personal opinions will be given and no references to or characterizations of opposing counsel will be made except by way of identification of arguments raised in the other party's summation. Both sides may comment about the evidence, or the lack of evidence. The Empire State building or destroyed airplane analogies are not appropriate and will not be permitted. The elements of damage will be defined and no reference will be made for an award "in memory of."

Further applications with respect to the conduct of the trial will be permitted at the time of the pretrial conference and made a part of the final pretrial order.

### Conscious Pain and Suffering

Defendants have moved pursuant to Rule 50(b) for a judgment notwithstanding the verdict on the issue of conscious pain and suffering. The jury awarded plaintiff $10,000 for Dr. Lin's pain and suffering before his death. For the reasons given below, the court rejects defendants' motion.

New York provides a cause of action for the pain and suffering of a decedent before his death. In several cases it has been held that a decedent's estate may recover for the decedent's pain and suffering endured *after* the injury that led to his death. *See Dullard v. Berkeley Associates Co.*, 606 F.2d at 894–95; *Juiditta v. Bethlehem Steel Corp.*, 428 N.Y.S.2d 535, 543, 75 A.D.2d 126 (1980); *Tenczar v. Milligan*, 365 N.Y.S.2d 272, 275, 47 A.D.2d 773 (1975). From this proposition, it is only a short step to the allowing of damages for a decedent's pain and suffering *before* the mortal blow and resulting from the apprehension of impending death. In two of the cases cited above, the courts identified apprehension of impending death as a distinct element of the damages to be awarded for post-injury pain and suffering. *Juiditta*, 428 N.Y.S.2d at 543; *Tenczar*, 365 N.Y. S.2d at 275. Indeed, courts applying New York law have explicitly held that, upon a sufficient showing of such apprehension, recovery for pre-injury pain and suffering is permissible. *See Malacynski v. McDonnell Douglas Corp.*, 565 F.Supp. 105 at 107 (S.D.N.Y.1983); *Anderson v. Rowe*, 425 N.Y.S.2d 180, 181, 73 A.D.2d 1030 (1980).[4]

---

**3.** Defendants' motion for judgment notwithstanding the verdict on pain and suffering is discussed below.

**4.** Defendants cite *Clancy v. Port of New York Authority*, 389 N.Y.S.2d 615, 55 A.D.2d 587 (1976) as support for the proposition that New York law does not provide a cause of action for pain and suffering resulting from apprehension of death. Although such apprehension may have existed on the part of the decedent in that case, the court appears to have considered only post-injury pain and suffering.

Given this state of the law, the question in this case is whether plaintiff has presented sufficient evidence of Dr. Lin's apprehension of his impending death for the jury's $10,000 award on this issue to withstand a motion for judgment notwithstanding the verdict. It is helpful to note first that, in considering such a motion, the court is "bound to view the evidence in the light most favorable to [the party opposing the motion] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." [5]

■ Under the cases, a plaintiff, to recover for apprehension of impending death, must show that before the injury, decedent was "aware of the danger and suffered from pre-impact terror," *Anderson*, 425 N.Y.S.2d at 181, or that decedent "experienced fear and/or was aware that [ ]he faced probable death prior to the aircraft's crash." *Malacynski*, at 107. I hold that, viewing the evidence in the light most favorable to Lin, such a showing has been made.

Dr. Lin was assigned to a left rear window seat. The plane lost its left engine and part of its left wing at the very start of its 31-second flight. It ascended normally for 20 seconds, then began to roll to the left as its nose began to tilt down. By three seconds before impact, it had reached a 90-degree left bank.

Since there were no survivors of the crash, there can be no direct evidence of Dr. Lin's or other passengers' pain and suffering before impact. However, given that Dr. Lin was assigned to a window seat on the plane's left side, and given the reasonable inference that he was in his seat during these first 30 seconds of the plane's takeoff, the jury might reasonably have inferred that Dr. Lin saw the engine and other pieces break away from the plane. Even if he did not see the damage, the jury might still have reasonably inferred that the sudden change in the plane's attitude—

from steep ascent to sharp banking and nose-down descent—notified Dr. Lin of the impending disaster and caused him pain and suffering in the seconds before the crash. There was sufficient evidence upon which the jury could base its verdict and defendants' j.n.o.v. motion is therefore denied.

IT IS SO ORDERED.

---

**5.** *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). The court made this statement in reference to a motion for a directed verdict, but the identical standard applies to a motion for judgment notwithstanding the verdict. *See* C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2537 at 599 (1971).