■ LEOMIE WARMSLEY, Respondent, et al., Plaintiff, v CITY OF NEW YORK, Appellant. — In an action to recover damages for personal injuries, etc., defendant appeals, as limited by its brief, from so much of a judgment of the Supreme Court, Kings County (Pino, J.), entered June 17, 1981, as is in favor of plaintiff Leomie Warmsley in the principal sum of $2,000,000, upon a jury verdict. Judgment affirmed insofar as appealed from, with costs. On February 13, 1977, Leomie Warmsley (hereafter plaintiff), a 43-year-old housewife, was seriously injured while riding as a passenger in a vehicle driven by her husband, when the vehicle crashed into a railroad support post on Atlantic Avenue in Brooklyn, New York, as a result of a defect in the street. Following the accident, the plaintiff was taken to St. Mary's Hospital where she remained for 40 days. The plaintiff's injuries included the following: head injury; crushing injury to the chest wall, including a fracture of the rib cage on both sides; fracture of the sternum; fracture of the clavicle; fracture of the left wrist and forearm; and comminuted fracture of the tibia and fibula of the right leg. Initially, an emergency tracheostomy was performed and a plastic tube and breathing mechanism remained in place for the major portion of her hospitalization. A closed reduction and manipulation was performed with reference to the multiple fractures of the right tibia and fibula and the leg was placed in a cast. On March 11, 1977, an open reduction and internal fixation was performed. Clamps were used to hold the fractured pieces of bone together and then a six-inch-long steel plate was screwed into the site with eight screws in an attempt to restore the bones to their original position. On April 18, 1977, plaintiff was readmitted to St. Mary's Hospital, where she remained until April 29, 1977, due to a condition known as osteomyelitis which had developed in the injured leg. On June 15, 1977, plaintiff was again admitted to St. Mary's Hospital where she remained until August 10, 1977, a total of 57 days. By this time, a necrosis had developed over the bone and steel plate, and this left a

large hole in the leg through which there was drainage of pus and a bad odor. These conditions required a surgical procedure to debride the wound and remove bone and the necrotic tissue. On July 7, 1977, a skin graft five inches long and one- and one-half inches wide was taken from two places on plaintiff's right thigh and grafted onto the site of the wound in an attempt to close the hole. This procedure proved unsuccessful and resulted in further infection. An operation was performed on August 7, 1977 for the removal of the plate and screws and the wound was irrigated with Garamycin. After plaintiff's discharge from St. Mary's Hospital, she continued as an outpatient for approximately seven months. Antibiotics, including Gentamicin, were prescribed. She remained in the plaster cast. However, there was no progress as the fracture was still not united notwithstanding the immobilization, and it was still infected. The plaintiff was hospitalized in April, 1978 in Beth Israel Medical Center. She remained there for more than 40 days and underwent an operation for the removal of the necrotic tissue and so much of the osteomyelitic bone as possible because it had never healed and was a chronic source of infection. This left a gap between the two bones which meant there was no way the opening could ever be bridged on its own. Subsequent to plaintiff's discharge from Beth Israel Medical Center, she was seen by Dr. Arthur Friedman, an orthopedic surgeon, at regular intervals in his office for the next few months. The leg was irrigated and cleaned constantly and the plaster cast had to be changed because it became soft and soiled and gave off a terrible odor. On June 12, 1978, the plaintiff was admitted to the Hospital for Joint Diseases for one day to change the cast. On April 8, 1979, plaintiff was hospitalized in the Hospital for Joint Diseases — her sixth hospitalization. She underwent her seventh operation on April 10, 1979, a six-hour procedure, for the external fixation of the fracture and placement of a Hoffman apparatus on plaintiff's leg. Three holes were drilled for a length of six to eight inches through the bone at various levels and two pins were inserted near the ankle below the fracture and three pins were inserted above the fracture. Long devices were applied on the outside of the leg to which clamps, screws, nuts, bolts and washers were utilized. It was hoped that in time this would compress the bones together. In one of the operative procedures, large bone grafts were removed from the "anterior superior spine" and inserted into the fracture area. A further procedure involved the removal of the fibula because it was holding the bones apart. The Hoffman apparatus had to be changed and adjusted from time to time which required further periods of hospitalization. Dr. Friedman continued outpatient treatment at the hospital from the date of discharge until plaintiff's next hospitalization, in August, 1979. In October, 1979, plaintiff was again hospitalized for 15 days in the Hospital for Joint Diseases. This stay was for the eighth operation and involved one of the newest methods of bone-healing techniques for "non-union" whereby electrodes were inserted into plaintiff's right leg. It was believed that the electrical stimulation of the bones would bring them back to life and allow healing. This procedure required plaintiff to return to the Hospital for Joint Diseases for one day on four separate occasions for the adjustment of the electrodes. From January 20 through January 24, 1980, plaintiff was hospitalized again in the Hospital for Joint Diseases to treat the drainage and the infection. She was discharged in a wheelchair and used crutches to walk. From February 25 through March 21, 1980, plaintiff was once again admitted to the Hospital for Joint Diseases. On February 26, 1980, the ninth operation was performed, for removal of the Hoffman apparatus and all of the pins and electrodes because it was obvious no bone was being created and it was no longer worthwhile to pursue that course of treatment. Despite the uncontrolled infection, all antibiotics had to be discontinued because of a toxic side effect — a bilateral hearing loss. Plaintiff was

hospitalized in the Hospital for Joint Diseases for 80 days between June and August, 1980. On June 3, 1980, plaintiff underwent a six-hour osteosynsthesis operation with "AO" compression plating of the right tibia-fibula. Thus, an eight- to nine-inch-long steel plate was screwed into the fracture site with nine screws. In conjunction with the insertion of the steel plate, another operative procedure was performed on the plaintiff's hip to obtain bone grafts for emplacement at the fracture site. This entailed making another incision in her hip to expose the bone and slices of bone in various dimensions were removed and inserted in the area of the fracture for support. The grafting meant another operation and left a permanent scar at her hip where the bone grafts were taken. Moreover, the plaintiff developed a severe and significant postoperative infection which spread to her hip and necessitated that she be put in isolation. As a result, plaintiff was depressed and had constant fits of crying. Following her discharge from the hospital on August 21, 1980, plaintiff continued to see Dr. Friedman on an outpatient basis. Notwithstanding all of these procedures and treatments, as of November, 1980, plaintiff's condition remained basically unchanged. The fracture was still unhealed, gross infection was present, and she was still suffering from consistent and persistent pain. Accordingly, on November 17, 1980, plaintiff was readmitted to the Hospital for Joint Diseases. Since it was believed that nothing further could be done to save the leg and because she could no longer stand the pain, on November 25, 1980, plaintiff underwent an operation whereby her leg was amputated at a point approximately five inches below the knee. However, following removal of her leg, the plaintiff continued to suffer "phantom pain", which Dr. Friedman testified was a frequent reaction of the body to an amputation. Subsequently, plaintiff expressed doubts that she would ever be able to wear an artificial leg because she was afraid it would cause her pain and believed it would not really be a part of her body. Thus, she could only ambulate with the aid of crutches. She has had scarring and repeated episodes of infection, abscess formation, and pain. Moreover, since she has to put pressure on her wrist, this aggravates and re-injures it, causing excessive pain. In addition, she had two painful boils under each armpit which were caused by the crutches. Furthermore, due to her having to put all the pressure on one leg, the excess strain will ultimately lead to the development of arthritis in the lower back. The plaintiff, who was very active prior to this occurrence, now feels she can do very little or nothing at all and feels that her husband does not have the same emotional feeling towards her because she is a one-legged woman. Under the circumstances of this case, plaintiff's injuries to the head and chest, fractures of the wrist, forearm, sternum, clavicle and both sides of the rib cage, and comminuted fracture of the tibia and fibula of the right leg, with subsequent infection and eventual amputation, were indeed catastrophic and caused her to go through literally a "living hell" for a period of almost four years and she undoubtedly will continue to endure a lifetime of pain and suffering. Accordingly, the award should be affirmed. Mangano, J. P., Gibbons, O'Connor and Thompson, JJ., concur.