■ ASTOR COVER et al., Respondents, v HELEN COHEN, as Administratrix of the Estate of IRVING COHEN, Deceased, et al., Appellants. — In an action to recover damages for personal injuries, etc., on theories of negligence, breach of warranty and strict liability in tort, defendants Helen Cohen, as administratrix of the estate of Irving Cohen, deceased, General Motors Corporation (hereinafter GM) and Kinney Motors, Inc. (hereinafter Kinney), appeal from a judgment of the Supreme Court, Kings County (Shaw, J.), entered June 10, 1981, which, upon a jury verdict, is in favor of plaintiff Astor Cover in the principal sum of $3,000,000 and plaintiff Pearl Cover in the principal sum of $1,000,000, following a four-week bifurcated jury trial. Judgment reversed, on the facts and as a matter of discretion, without costs or disbursements, and new trial granted upon the issue of damages only, unless, within 20 days after the service upon plaintiffs of a copy of the order to be made hereon, with notice of entry, the plaintiffs shall serve and file in the office of the clerk of the Supreme Court, Kings County, a written stipulation consenting to reduce the amount of the verdict in their favor to a total of $2,300,000 to be allocated $2,000,000 to Astor Cover and $300,000 to Pearl Cover, and to the entry of an amended judgment accordingly, in which event, the judgment as so reduced and amended is affirmed, with one bill of costs to plaintiffs. On June 8, 1974, while standing on a sidewalk in Brooklyn, New York, Astor Cover, 62 years old, was crushed against a wall when a 1973 Chevrolet Malibu car being operated in reverse gear by defendant Cohen's decedent, Irving Cohen, jumped the sidewalk, as a result of the negligence of Irving Cohen and a product defect in the acceleration system of the automobile. Astor Cover suffered extensive physical and psychological injuries in the accident. Upon arrival at the hospital his crushed left leg was a collection of mangled muscles, arteries, fractured bones and torn skin. An intense outpouring of blood came from the fractured left tibia which was exposed through his skin. Mr. Cover also suffered a fracture of the left distal femur with marked posterior angulation and displacement. The fracture line continued through the articulating surface, i.e., into the knee joint; the lateral and medial condyles were broken off. There was a circumferential destruction of the muscles and neurovascular bundle of the left leg. The left popliteal artery was occluded. The left leg was

amputated seven inches *above* the knee on June 8, 1974. In addition, Mr. Cover's crushed right leg sustained a supracondylar fracture of the femur as well as a puncture wound which penetrated the knee joint and caused bleeding at the medial aspect. Mr. Cover was also subjected to surgery involving an open reduction of the femur in the right leg and the insertion of screws and the use of wires to hold the fragments together. That operation was ineffective and several months later Mr. Cover was forced to undergo still another operation to remove the screws and to clean out an infection in his right femur. His right leg was placed in a hip-to-foot cast and remained in traction for approximately six months. Mr. Cover was hospitalized for 17 consecutive months in two different hospitals following the accident. During the first nine months of hospitalization, he was completely confined in a horizontal position, received numerous skin grafts and experienced drainage of pus from a hole in his right knee. Prior to the accident, Mr. Cover had minimal diabetes but did not require insulin. Immediately thereafter, however, his doctors required him to use insulin due to his injuries and resulting infection. His diabetes is now under control requiring oral medication. Mr. Cover suffered intense pain during his hospitalization. During his hospital stay he used numerous pre-scribed drugs. At times he refused these drugs for fear of becoming addicted. Physical therapy was a slow process for Mr. Cover. It was not until 11 months after the accident that he could walk independently from parallel bars to a walker. After 102 treatments at a rehabilitation center, Mr. Cover was able to function from a "wheelchair level" but not from a "standing" level. He must continue exercising his leg, stump and arms every day in order to lift himself from his wheelchair, use a prosthesis and walk with a brace. Undisputed medical testimony revealed that six years after the accident, Mr. Cover could only stand with the aid of canes with forearm extensions, a prosthesis and a long leg brace for his right leg. His right leg was atrophic as well as cold and purplish. His right knee contained a hole from which pus leaked, and it bent only 80 degrees rather than the normal 145 degrees. Both his right hip and ankle remained stiff. There is a possibility of further hospitalization and surgery if the infection in the right leg worsens. Mr. Cover's limited ability to walk with the aid of braces requires strong arm support. With age, his arm strength will diminish and he will further lose the use of his legs; he will become increasingly dependent on outside assistance. Prior to June 8, 1974, Mr. Cover was very active. He is now virtually confined to a wheelchair and cannot participate in active sports or hobbies such as painting or woodworking. Six years after the accident, he still suffered from "phantom pain" in his missing limb. Although the injuries sustained by plaintiff Astor Cover are severe, in light of all the factors in this case, including his age (62 years old at the time of the accident in 1974), the damages awarded were excessive to the extent indicated. We have reviewed defendants' other contentions and find them to be without merit. Damiani, J. P., Titone, Gulotta and Rubin, JJ., concur.