■ CELESTINO LUCAS, Respondent, v NEW YORK CITY TRANSIT AUTHORITY, Appellant.—Judgment, Supreme Court, New York County (Ira Gammerman, J.), entered October 11, 1988, which, upon a jury verdict in favor of plaintiff in the amount of $3 million, apportioning liability 80% to defendant and 20% to plaintiff, and upon denial of defendant's motion to set aside the verdict, awarded plaintiff judgment in the amount of $2,607,248.10, modified, on the law and the facts, by vacating the apportionment of liability and substituting therefor a provision apportioning liability at 40% for defendant and 60% for plaintiff and the verdict is reduced accordingly; the judgment is otherwise affirmed, without costs.

The jury's verdict attributing 20% of the responsibility for the accident to plaintiff and 80% to defendant is contrary to the weight of the evidence. Based on the evidence introduced at trial, any failure on the part of defendant cannot be deemed to amount to more than 40% of the negligence, and we modify accordingly.

At approximately 9:15 P.M. on May 8, 1983, George Johnson, the motorman of a nine-car No. 3 train, began his approach into the 34th Street and 7th Avenue subway station when he saw plaintiff in the air above the tracks. Plaintiff landed feet first onto the tracks and in one continuous motion, turned to face the train, crouched down and then stretched out across the tracks. The motorman, who testified that the train was traveling at between 15 to 20 miles per hour, first observed plaintiff from 52 feet (one car length) away and immediately put the train into emergency by pulling back the emergency brake. Fifteen feet of the first car of the train passed over plaintiff before it came to a complete stop, severing his legs below the knee.

Plaintiff's medical experts testified that plaintiff's actions in jumping to the tracks were involuntary and the result of a postictal psychosis stemming from epilepsy. Defendant maintained that plaintiff was attempting suicide. Plaintiff also claimed that the motorman was negligent in failing to stop the train before contact. The jury found the motorman negligent in failing to bring the train to a stop before it made contact with plaintiff but also found that plaintiff was acting in a conscious, volitional manner when he jumped to the tracks. While apparently discrediting the opinions of plaintiff's medical experts, the jury nonetheless apportioned liability at 80% for defendant and 20% for plaintiff.

The jury's apportionment of liability, after finding that plaintiff's actions in jumping to the track were voluntary, was against the weight of the evidence *(see, Robinson v New York City Tr. Auth.,* 105 AD2d 614). We disagree, however, with the dissent's conclusion that the finding that the motorman was negligent was also against the weight of the evidence. As the dissent points out, the parties' experts disagreed as to the distance within which the motorman could have stopped the train. It is well settled, however, that "[t]he weight to be afforded the conflicting testimony of experts is a matter peculiarly within the province of the jury" *(Sternemann v Langs,* 93 AD2d 819; *see also, Norfleet v New York City Tr. Auth.,* 124 AD2d 715, *lv denied* 69 NY2d 605; *Chodos v Flanzer,* 109 AD2d 771). Although the dissent attempts to discredit the expertise of plaintiff's safety and health consultant, his credentials as well as his opinions and calculations relied on in arriving at his conclusions were subjected to extensive cross-examination. By crediting his testimony that the motorman could have stopped the train before hitting plaintiff, the jury did not engage in speculation or conjecture *(cf., Bernstein v City of New York,* 69 NY2d 1020; *Cassano v Hagstrom,* 5 NY2d 643, *rearg denied* 6 NY2d 882). Instead, plaintiff demonstrated facts and conditions from which the negligence of defendant could be reasonably inferred *(cf., Bernstein v City of New York, supra).* Therefore, viewing the evidence in the light most favorable to plaintiff, we conclude that the jury verdict finding defendant negligent was in accordance with the weight of the evidence. *(Supra.)*

In view of the extensive injuries suffered by plaintiff, the amount of damages awarded does not shock the conscience *(see, Moran v City of New York,* 153 AD2d 607; *Neal v Rainbow House Fruits,* 87 AD2d 511).

We have considered defendant's remaining contentions and

find them to be without merit. Concur—Carro, Rosenberger and Ellerin, JJ.

Sullivan, J. P., and Smith, J., dissent in a memorandum by Smith, J., as follows: I dissent because the verdict was against the weight of the evidence, because the apportionment of liability was against the weight of the evidence and because the award was excessive.

Plaintiff's legs were severed below his knees when on May 8, 1983 at approximately 9:15 P.M., he jumped onto a subway trackbed, lay down across the tracks and was run over by an oncoming train.

Plaintiff, an epileptic, disclaimed all responsibility for the accident, arguing that his actions were involuntary and the result of a prolonged trance following a seizure suffered earlier that day. He contended that the motorman, who had sufficient opportunity to observe his conduct on the tracks, was negligent in failing to stop the train before it ran him over.

The motorman, who prior to the accident had operated trains on the IRT number three line for some 13 years, testified that the train entered the station at a speed of less than 15 to 20 miles per hour. This was due to a curve on the tracks ending just prior to entering the 34th Street station. According to the motorman, about 150, or three car lengths, into the station, he observed plaintiff, some 52 feet in front of him and in midair above the tracks. He immediately pulled back the brake handle and blew the whistle, while continuing to observe plaintiff who landed on his feet, pivoted and lay down on the tracks. The train came to rest some 13 feet, or about one-fourth car length, over plaintiff.

The record reveals that the 59-year-old plaintiff, who suffered from and was being treated for epilepsy, was estranged from his wife, had been unemployed since 1972, had previously attempted suicide, and had a psychiatric history of depression and of violent episodes. Plaintiff testified that he had only a vague recollection of his activities on the day of the accident. He recalled, however, leaving Metropolitan Hospital early that morning and drinking beer during the day. Emergency Medical Service attendants reported the smell of alcohol on plaintiff's breath following the accident.

Two neurologists retained by plaintiff offered their opinions that Lucas' leap from the platform was spurred by postictal psychosis, a trance-like state of confusion, which followed an epileptic seizure which they believe plaintiff suffered that

morning and for which plaintiff was admitted to Metropolitan Hospital. The hospital records reveal that plaintiff was admitted to Metropolitan Hospital early that morning "hyperventilating and feigning, comatose state without fibulation [fibrillation]" and that he walked out of the hospital at about 8:45 A.M.

A science expert called by plaintiff testified that, upon breaking, before coming to rest, a train moving at 15 miles per hour would continue to travel about 75 feet, within approximately 6½ seconds. These calculations included consideration of the motorman's approximated reaction time and of the approximate time required for the train's braking system to operate once activated. Plaintiff's expert also indicated that it would have taken plaintiff 6 to 8½ seconds to jump from the platform, whirl around and lie down. This conclusion was based upon the 79-year-old expert timing himself with a stop watch as he jumped off the porch of his New Jersey home.

An engineer called by the defense, with a background in the design and operation of trains, testified that once thrown into emergency, the stopping distance for the nine-car train when traveling approximately 15 miles per hour was 60 to 75 feet within 5 to 6 seconds. He concluded, based upon demonstrations with several Transit Authority employees, that it would have taken plaintiff 3 to 4 seconds, once he was in midair, to assume his position on the tracks.

The jury answered interrogatories indicating that the motorman was negligent in failing to bring the train to a stop before it made contact with plaintiff and that plaintiff was acting in a conscious, volitional manner when he jumped to the tracks. It found the motorman and plaintiff negligent to the extent of 80% and 20%, respectively, and set damages at $3 million.

The court denied defendant's motion to set aside the verdict on the issues of liability and damages, concluding that the jury was not bound by the expert's testimony as to how much time elapsed between plaintiff's jump and the accident. Based upon the motorman's testimony that he had plaintiff in view all the time he was on the track, the court held that the jury was free to conclude that the motorman viewed plaintiff for substantially longer than he claimed prior to applying the brakes. Based upon the nature of plaintiff's injuries, the extensive period of hospitalization, and the pain and suffering occasioned, the court found that the award was not shocking. Finally, the trial court refused to substitute its judgment for that of the jury with respect to the allocation of damages.

In all negligence cases the fact of negligence may be proven circumstantially. *(Feblot v New York Times Co.,* 32 NY2d 486, 494 [1973].) However, "where the evidence is capable of an interpretation which makes it equally consistent with the absence as with the presence of a wrongful act, that meaning must be ascribed which accords with its absence. In other words, [negligence] can only be established by proof of such circumstances as are irreconcilable with any other theory than that the act was done." *(Digelormo v Weil,* 260 NY 192, 199-200 [1932]; *Feblot v New York Times Co., supra; Bernstein v City of New York,* 69 NY2d 1020, 1021 [1987].)

Here, the evidence was undisputed that the train entered the station at approximately 15 to 20 miles per hour. Plaintiff's scientific expert testified that it would have taken between 6 and 8½ seconds for plaintiff to have jumped and positioned himself upon the tracks. He further testified that it would have taken the motorman approximately 6 to 6⁶⁄₁₀ seconds to stop the train, assuming that the train was traveling at 15 miles per hour. Plaintiff's counsel's examination of the motorman attempted to establish that the motorman's observations of plaintiff's actions on the track were so extensive that these observations must have commenced from a distance of more than 52 feet. However, the only evidence as to how long plaintiff was on the track reveals that the motorman could have observed all that he did and still have activated the braking system from 52 feet away, causing the train to stop within 75 feet and within 6½ seconds. This evidence was provided by plaintiff's own witness. To reach a contrary conclusion, the jury was required to speculate.

As defendant acknowledges, if the train had been traveling at 15 miles per hour and if it took plaintiff more than 6⁶⁄₁₀ seconds to maneuver onto the tracks, the Transit Authority might be liable. However, since the evidence presented showed a number of time-distance combinations, one or more of which suggest that the motorman was not negligent, plaintiff has failed to prove that the negligence of the defendant's train operator caused his injury.

Moreover, the jury's apportionment of liability between defendant and plaintiff, who they found voluntarily jumped from the platform, also was against the weight of the evidence. The evidence supports the view that plaintiff positioned himself on the tracks in order to effect the resulting injury. *(See, Robinson v New York Tr. Auth.,* 105 AD2d 614 [1st Dept 1984] [apportionment of 40% for defendants and 60% for

plaintiff who was intoxicated and stumbled into the train as it left the station]; *Gonzalez v City of New York,* 123 AD2d 666 [2d Dept 1986].)

Finally, in view of the absence of claimed lost earnings the award of $3 million in damages was excessive.