**Edwin FUENTES, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

**No. 88 Civ. 4474 (KC).**

United States District Court, S.D. New York.

April 14, 1992.

**640**

David M. Lee, New York City, for plaintiff.

Steven Knitzer, Schnader Harrison Segal & Lewis, New York City, for defendant.

## MEMORANDUM ORDER

CONBOY, District Judge:

This case concerns a jury determination of negligence and damages. The trial involved the alleged negligence of a railroad company when its train, proceeding caboose-first in the early hours of the morning, allegedly injured the plaintiff, Edwin Fuentes, who was sleeping by the railroad track next to a stack of radiators. Defendant Consolidated Rail Corporation ("Conrail") moves for a judgment notwithstanding the verdict or, alternatively, for a new trial or *remittitur*, as to the jury trial conducted, intermittently, from March 12 to March 26, 1991. The jury found Conrail 64% liable for injuries suffered by Fuentes, and, after reducing total damages by comparative negligence calculations, the jury awarded Fuentes $2,854,741.10.

### I. Motion for Judgment Notwithstanding the Verdict

After a careful review of the record, the Court finds that, giving Fuentes the benefit of all reasonable inferences, (1) the amount of evidence favorable to Fuentes was sufficient for the jury to have found without conjecture that Conrail was 64% liable for Fuentes' injuries, and (2) the amount of evidence in favor of Conrail was not so overwhelming that a determination against Conrail was unreasonable [1].

### A. Duty of Care

■ The parties do not dispute that a railroad owes a duty of reasonable care to those on or near a railroad track, whether trespassers or not [2]. Conrail argues, however, that the accident that occurred was not foreseeable because, it asserts, Fuentes was hidden from view by the stack of radiators [3]. Memorandum of Law of Defendant Consolidated Rail Corporation in Support of its Motion for Judgment Notwithstanding the Verdict or Alternatively, for a New Trial, or for Remittitur Dated April 16, 1991 ("Conrail Memo") at 11. Conrail argues: first, Fuentes was sleeping and not noticeably moving at the time of the accident; second, Fuentes was hidden from the train crew's sight by a stack of radiators; and third, the area in which Fuentes slept was littered with rubbish. *Id.* In support of its arguments, Conrail cites *Palsgraf v. Long Island Railroad,* 248 N.Y. 339, 162 N.E. 99, *reh. denied,* 249 N.Y. 511, 164 N.E. 564 (1928) [4].

---

1. The Second Circuit's standard for granting a judgment notwithstanding the verdict is as follows:

    [A]fter viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him. *Mattivi v. South African Corp, "Huguenot,"* 618 F.2d 163, 168 (2d Cir.1980).

2. There was no conclusive evidence offered at trial that Fuentes was trespassing on the railroad's property.

3. Conrail does not specify whether the lack of "foreseeability" relates to the duty owed or proximate cause branch of negligence. Assuming that Conrail challenges the "foreseeability" of the accident in both senses of the term, we will address the concept of foreseeability in our analyses both of duty of care and proximate cause.

4. Conrail further cites New York railroad cases decided both before New York abandoned the distinction between trespassers, licensees, and invitees, and before *Palsgraf.* Supplemental Brief of Defendant Consolidated Rail Corporation ("Conrail Supplemental Memo") at 7 n. 2. These courts did not have the benefit of the *Palsgraf* standard, and their holdings are based upon the standard of care owed to trespassers; therefore, these cases are not particularly helpful.

■ The Court knows of no general rule that a duty of care is owed only to those persons who are literally visible to the tortfeasor; foreseeability is not necessarily limited by one's actual knowledge of the situation at hand. *See Juiditta v. Bethleham Steel Corp.*, 428 N.Y.S.2d 535, 541, 75 A.D.2d 126 (1980) ("Lack of knowledge, in fact, of someone's presence on the tracks would not excuse South Buffalo from observing its own rules."). Thus, while we agree that the doctrine of scope of the risk enunciated in *Palsgraf* controls, the scope of the risk to be *"apprehended"*—not necessarily "seen"—depends on the circumstances in each case. *Palsgraf*, 248 N.Y. at 344, 162 N.E. at 100–101. Moreover, *Palsgraf* states that if varying inferences are possible, the range of reasonable apprehension becomes a question for the jury. *Id.* at 345, 162 N.E. at 101.[5] Therefore, it is necessary to ascertain whether a reasonable jury could have found that Conrail employees were on notice that persons may have been near the track and vulnerable to the type of accident that occurred in this case.

The circumstances of the area around a railroad track have a direct bearing on the foreseeability of a person's being on or near a railroad track. *Juiditta*, 428 N.Y.S.2d at 541. Viewing the relevant inferences in Fuentes' favor, it was reasonable for the jury to find that a person near the crossing of Edgewater and Garrison in the early morning hours was within the scope of foreseeable risk of being hit by large objects, such as a stack of radiators, in the way of a train. The area in question is located in a dilapidated, litter-strewn area of the South Bronx. Tr. 150; Plaintiff's Exhibit 21. It would have been reasonable for the jury to conclude that homeless people lived near the track. There was no testimony of any "no trespassing" signs in the area. Some of the testimony further reveals that people frequented the area at all hours. Robert Lapine, the locomotive engineer on the Conrail train during the accident testified that he was familiar with the scene of the accident, Tr. 460, and that he had seen people in the vicinity of the scene of the accident at 4 a.m. on various days. Tr. 493. Lapine's testimony was confirmed by a witness called by Conrail, Robert Lindsey, a Conrail locomotive engineer, who testified that he too was familiar with the scene of the accident, Tr. 778, and that he was not surprised to see people in the vicinity of the accident site late at night. Tr. 778–779.

As of the date of the accident, there was no barrier between the railroad tracks and the sidewalk by the crossing, Tr. 196, that would have shielded people from objects struck by the train. Because the people in the immediate vicinity of the Edgewater and Garrison crossing foreseeably may have been struck by an object in the path of a train, it was reasonable for the jury to have found that Conrail owed a duty of care towards Fuentes.

### B. Breach of Duty of Care

■ A reasonable jury further might have found, as did the jury in this case, that Conrail employees Ernest Hinton and Joe Carino failed to take steps that a normally prudent person would have taken under the circumstances. The caboose had stairs that protruded beyond the track area. As stated above, the scene of the accident was in a neighborhood in which people could be found at all hours. Although the train was moving about five miles an hour, Conrail's own practice of using lanterns to illuminate the railroad track is evidence that a train moving at this speed could cause harm.

The parties do not appear to dispute, and Conrail itself has stated in its book of rules for employees, that the proper course of action for an employee in doubt was to opt for safety. Book of Rules Examination, Consolidated Rail Department, Effective February 1, 1987, General Notice. In case of doubt as to whether an object on the track could cause harm of any sort, the safe course was to reduce the train's speed,

---

**5.** We further note that in *Palsgraf*, then Judge Cardozo relied heavily on the physical distance between the initial mishap and the location of plaintiff. In this case, Fuentes testified that he leaned against the cart; thus, he was situated directly next to the scene of the initial mishap.

stop the train at a proper distance from the object, make a warning signal, or step off the train and investigate the object. Tr. 235.

The jury heard admissions from Hinton and Carino on the issue of breach of duty of care. Despite qualifications and testimony to the contrary by Hinton, Hinton ratified certain prior deposition statements and made statements that could allow a reasonable jury to make the following inferences in favor of Fuentes as to liability: Hinton could see forty to fifty feet in front of him, Tr. 352; when he first saw an object in front of him shortly before the accident, it appeared uncertain whether the train would make contact, Tr. 359–360, 363–364, 366, 369, 376–377; he did not know the nature of the object or whether it was a person, Tr. 362, 366, 367; he did not immediately sound a whistle, radio the conductor, or notify Carino that he spotted an object, Tr. 360; about twenty or thirty feet away from the object, Hinton radioed the locomotive engineer to stop rather than asking Carino to make an emergency stop. Tr. 381. Despite qualifications by Carino, Carino stated that he was not certain at forty feet whether the train would clear the object, Tr. 637, and that only after the train hit the object did he initiate an emergency stop. Tr. 641.

From the occurrence of the accident itself, one can infer that the train crew did not leave a reasonable stopping distance between the train and the obstruction. Given the size of the obstruction, the rule of caution as enunciated by Conrail itself, and the admissions by Carino and Hinton, we find that the jury's allocation of 64% liability to Conrail was reasonable [6].

### C. Proximate Cause of the Injury: Foreseeability

In order for a defendant's wrongful act to be a proximate cause of a plaintiff's injury, one must, in view of all the surrounding circumstances, be able to foresee the consequences of defendant's wrongful act. See Ward v. State, 366 N.Y.S.2d 800, 807, 81 Misc.2d 583 (1975). The issue of what is a foreseeable consequence of defendant's conduct may be subject to varying inferences, so the issue of foreseeability is generally left for the jury to resolve. Bahan v. Green Bus Lines, Inc., 465 N.Y.S.2d 784, 785, 96 A.D.2d 876, aff'd 474 N.Y.S.2d 722, 61 N.Y.2d 922, 463 N.E.2d 38 (A.D.1983). "To establish foreseeability, plaintiffs need not demonstrate ... that the precise manner in which the accident occurred or the extent of the injuries was foreseeable." Id.

Much of the physical evidence that might have pointed to the exact sequence of events was destroyed, so it is unclear exactly how the accident occurred; however, a reasonable jury could have determined that Fuentes' injuries were a foreseeable consequence of the negligence of Conrail employees. The alleged wrongful act that occurred was the train crew's moving toward an object "stacked, as though it was high off the [guard]rail" (Tr. 359–360) that might have blocked the train's path without stopping to determine the nature of the object. There was no guardrail or ditch between the sidewalk area of the train crossing and the tracks themselves. It was not a remote possibility that a large, unknown object littering a railroad track would have been heavy and metallic. Several foreseeable consequences might occur as a result of failure to take such an object

6. The Court finds cases cited by Conrail on the issue of defendant's breach of duty of care distinguishable from the case at hand. In Dobb v. Baker, 505 F.2d 1041, 1042–1043 (1st Cir.1974), the brakeman initially thought that plaintiff, who lay on the track in front of him was a piece of paper; however, he took actions to stop the train once he perceived that a human being lay in front of the train. In that case, the Court stated that, under the applicable Massachusetts law, ordinary care was owed to trespassers once they were perceived to be on the property, and that the brakeman gave such ordinary care once plaintiff was perceived. Id. at 1043. In Eusey

v. Consolidated Rail Corp, No. 88–3238, slip op. (3d Cir. Sept. 9, 1988), the Court noted that the train crew initially saw a pile of rags in front of them, id. at 5, and ratified the district court's finding that the crew's failure to stop in those circumstances was not willful and wanton under Ohio law, id. at 3. In this case, the object perceived by Hinton and Carino appeared to be stacked, in Hinton's words, "high off the [guard]rail," Tr. 359–360, Hinton and Carino were in doubt as to whether the train could clear the object, and Hinton testified that he did not know whether the object was a person.

seriously, such as the object's injuring a passerby, or the object's knocking off balance a person located near the side of the tracks. In the latter instance, it is not unreasonable to foresee that a person could be in immediate danger of falling into the path of the train. Accordingly, we hold that the jury's finding was reasonable.

## II. *Conrail's Motion for a New Trial*

■ Conrail argues that although the Court cited applicable legal doctrines in the jury charge, the Court failed to relate the explanations or definitions to the case or the factual contentions of the parties. In particular, Conrail argues that the Court should have accepted five of Conrail's proposed charges on the elements of negligence as applied to the facts of the case. Memorandum of Law of Defendant Consolidated Rail Corporation in Support of its Motion for Judgment Notwithstanding the Verdict or, Alternatively, for a New Trial, or for Remittitur ("Conrail Memo") at 18–19.

We rejected Conrail's proposals because they both took out of the hands of the jury certain issues of fact and slanted the law towards Conrail's position when such a perspective was unwarranted. For example, one of the five proposals that Conrail argues that we should have adopted was conclusory and misleading:

It would have made no sense for the train at issue to proceed more slowly or blow its horn because the crew had no reason to suspect that the object near tracks [*sic.*] was anything other than inanimate or that it presented any danger to the train or its crew. Conrail Memo at 19.

The above charge, which is taken verbatim from *Eusey* at 5, was inapplicable to Fuentes' suit. In *Eusey*, the Court explicitly based the above statement on 1) the plaintiff's failure to produce evidence that the crew acted improperly in proceeding after spotting the object and 2) the lack of obstruction of the private crossing. *Eusey* at 5–6, notes 3 and 4. These elements do not appear in our case.

The partisan nature of Conrail's other four proposals resembled closing arguments more than jury charges. For example:

The issue in this case was not whether any member of the Conrail crew made a mistake; the issue is whether any member of the crew was guilty of negligence. *Id.*

The Court disagrees with Conrail's arguments that the jury charge was not particularly suited to the facts of this case or failed to address the issue of foreseeability. The Court's instructions to the jury included, *inter alia*, the following charges:

In determining whether the defendant railroad exercised reasonable care, you must consider the circumstances surrounding the plaintiff's presence on or near the tracks, and whether the railroad had reason to foresee that someone might be situated on or near the tracks at the point where the accident happened. Tr. 1049.

The operator of a railroad is not an absolute insurer of the public's safety. There must be some failure to exercise due care or some failure to act with reasonable care under the circumstances, before liability may be imposed on a railroad operator. Tr. 1047.

A railroad owes a duty to persons on or near its track to exercise reasonable care in the movement of its trains for safety of such persons. Reasonable care means that degree of care that a reasonably prudent railroad operator would exercise under the same circumstances. Tr. 1048–1049.

Because the jury charge was made applicable to the facts of this case, we deny Conrail's motion for a new trial.

## III. *Conrail's Motion for Remittitur*

### A. Damages for Past and Future Lost Earnings

■ Under New York Law, "the loss of future earnings or earning capacity must be established with reasonable certainty." *Kirschhoffer v. Van Dyke*, 173 A.D.2d 7, 577 N.Y.S.2d 512, 514 (3rd Dep't 1991); *see Harrison v. Dombrowski*, 175 A.D.2d 37, 573 N.Y.S.2d 87, 88 (1st Dep't 1991).

In the instant case, plaintiff testified at trial that before the accident he earned approximately $200 per week selling scrap metal, doing body and fender work, and polishing automobiles [7]. Tr. 542, 544–46, 608. While Fuentes's employment evidence was "admittedly sparse," Fuentes's Brief in Opposition to Conrail's Motion for Judgment Notwithstanding the Verdict at 19, it was not so insufficient that the jury could not rely on it as a matter of law.

■ According to life expectancy tables, Fuentes, who was 31 years of age at the time of the trial, had a work-life expectancy of 28 years. Therefore, the jury's determination that Fuentes was entitled to $277,-200 for past and future lost earnings was entirely reasonable and supported by the evidence [8].

### B. Damages for Past and Future Medical Care

■ Conrail argues that the jury's award of $2,000,000 to Fuentes for Fuentes's past and future medical care is excessive.

At trial, Fuentes entered into evidence, without objection, two bills from the Bronx Municipal Hospital for his two hospitalizations after the accident; One bill was for $20,000 and the other was for $22,440. *See* Tr. 906.

Dr. David Present, Fuentes's expert, testified that if Fuentes elected to be fitted for a prosthesis for his amputated left leg, the total cost of the surgery, hospitalization, and physical therapy would be approximately $40,000. Dr. Present also stated that the cost of fitting Fuentes with the prosthesis would be approximately $7,500 to $8,000, and that the prosthesis would have to be changed every three to four years.

Assuming that Fuentes will require a new $7,500 prosthesis every four years, and that Fuentes's life expectancy is another 42 years, the total cost for Fuentes's prostheses over his lifetime will be approximately $75,000.

Dr. Present also testified that if the operation to strengthen Fuentes's right leg were not successful, it might become necessary to amputate part of the leg. The cost of that operation, according to Dr. Present, would be approximately $10,000. Tr. 912. If Fuentes were to have his right leg fitted for a prosthesis, the cost of the prosthesis over his lifetime, again assuming Fuentes lives another 42 years, would be $75,000. Tr. 912, 1013.

Moreover, Dr. Present testified that Fuentes will probably require a home-care attendant for at least 8 hours a day, but that Fuentes could require a home-care attendant for as much as 24 hours a day [9]. Tr. 914–915. Dr. Present asserted that a home-care attendant who works an eight

---

7. Conrail asserts that Fuentes stated at trial that Fuentes earned $200 for the entire year of 1985. Defendant's Supplemental Brief for Judgment Notwithstanding the Verdict at 14; Tr. 612. While Fuentes's testimony is not entirely clear, it appears from the context in which Fuentes made the remark, that when Fuentes stated that he made approximately $200 in 1985, Fuentes meant that he made $200 a week in 1985. This becomes plain when one considers that immediately after Fuentes stated that he made around $200 in 1985, he stated that he did not know how much he earned for the entire year of 1985. Moreover, this interpretation is consistent with Fuentes's earlier testimony, discussed above, in which Fuentes stated that he earned $200 a week.

8. All damage amounts discussed in section III of this opinion are damages calculated before Fuentes's contributory negligence is taken into consideration.

9. We note that at trial plaintiff stated that "[t]here is a woman that comes to my house that helps me to do everything. She helps me in the tub and she's provided through Social Security." Tr. 559. This vague statement does not reveal how often the woman paid for by social security comes in to help plaintiff, how long she stays with him, and what exactly she does. More to the point, by foregoing exploration of this matter, Conrail's counsel inexplicably forfeited the opportunity to establish the amount and duration of plaintiff's disability social security benefits. Moreover, neither plaintiff nor defendant made reference to this statement at trial or in their post-trial papers. We must assume that the jury took this statement into consideration when it calculated plaintiff's award for future medical expenses, and therefore this statement is not a basis upon which we will set aside any portion of plaintiff's award for future home-attendant and nursing home care.

hour shift earns approximately $25,000 a year. Tr. 915. In addition, Dr. Present stated that as Fuentes becomes older he will need more care, and that at some point it might be "more feasible medically and economically to have [Fuentes] in some kind of nursing facility." Tr. 916. Such care costs approximately $40,000 a year. Tr. 917. As Fuentes is expected to live for another 42 years, the jury's determination that Fuentes was entitled to at least $1,757,560 for future home-care attendants and nursing home care was entirely reasonable and supported by the evidence[10].

In sum, there is ample basis in the record for the jury's award of $2,000,000 to Fuentes for his past and future medical expenses, and therefore we will not disturb the jury's determination.

### C. Damages for Pain and Suffering

■ Conrail maintains that the jury's award to Fuentes of $2,183,333 for pain and suffering is excessive.

In the instant case, Fuentes suffered a traumatic below the knee amputation of his left leg at the accident site, and later surgeons found it necessary to amputate the remainder of Fuentes's left leg below the knee. Tr. 890–91. In addition, Fuentes's right leg was almost completely amputated as a result of the accident and the skin and muscle of his right leg were torn off like a glove. Tr. 895–96. Surgeons were able to reattach Fuentes's right leg, but the leg is still extremely shrunken and withered, has "much less muscle and skin than [it] started out with," and has nerve damage. Tr. 897. Moreover, Fuentes's right foot can no longer turn up and out, and Fuentes can no longer put his right foot down on level surfaces. Tr. 897–98. Fuentes suffered and still suffers "deep pain" as a result of the accident. Tr. 558–59; 561–62; 909.

Dr. Present testified that because of the function that Fuentes has lost in his right leg, Fuentes will need an operation on his right leg before he can be fitted with a prosthesis for his left leg. Tr. 899–900.

The operation, whose object will be the fusing Fuentes's right ankle so that his right foot can rest squarely on the ground, will require surgeons to remove bone from Fuentes's hip and attach the bone with screws to Fuentes's right ankle. Tr. 900 Dr. Present testified that there is only a 50% chance that this operation will be successful, Tr. 908, and that even if it is successful, Fuentes will have to wear a cast for five or six months, and will need months of rehabilitation to learn how to walk with a prosthesis. Tr. 901–03. Moreover, it is possible that until Fuentes's prosthesis is fitted correctly, it will rub Fuentes's stump and will cause irritation, pain, and infection. Tr. 905. Should the operation on Fuentes's right leg be unsuccessful, there is a 75% chance that Fuentes will never walk again and will be confined to a wheelchair. Tr. 910–11. Moreover, should the pain in Fuentes's right leg become intense enough, Fuentes's right leg will be amputated. 909–10.

> The Second Circuit has stated that
> [i]n determining whether an award is so excessive as to shock the judicial conscience, we [must] look, as a court sitting in diversity, to other jury awards condoned by the state whose substantive laws govern the rights of the parties.... [W]e [ ] have the responsibility to ensure "that the damage award does not exceed that which could be sustained were the case before the highest court of the state whose substantive law gives rise to the claim."

*Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 750 (2d Cir.1984) (quoting *Hysell v. Iowa Public Service Co.,* 559 F.2d 468, 472 (8th Cir.1977)). With the Second Circuit's admonition in mind, and considering Fuentes's past and expected future suffering, we do not believe that the jury's $2,183,333 pain and suffering award to Fuentes is so large that it "shocks the judicial conscience." In *Williams v. Aer Lingus Irish Airlines,* 655 F.Supp. 425, 426 (S.D.N.Y.1987), Judge Weinfeld upheld a jury's pain and suffering award of

---

**10.** That plaintiff may be cared for by his family rather than home-care attendants does not affect this analysis. *Regardless of who cares for plaintiff, plaintiff is entitled to recover from defendant the value of the care that will be* given to plaintiff. *See Pressey v. Patterson,* 898 F.2d 1018, 1026 (5th Cir.1990) (plaintiff entitled *to recover the value of his mother's caregiving services*).

$1,200,000 to a child whose foot got stuck in an escalator. Clearly, Fuentes's injuries in the instant case are more serious than those of the plaintiff in *Aer Lingus*, and thus they merit a higher pain and suffering award.

Moreover, in a recent New York case in which a subway train severed both of the plaintiff's legs below the knee, the Appellate Division held that in light of the severity of the plaintiff's injuries, the jury's $3,000,000 damage award was not excessive. *Lucas v. New York City Transit Authority*, 163 A.D.2d 21, 557 N.Y.S.2d 919, 920 (1st Dep't 1990).

The cases cited by Conrail are not to the contrary. *Williams v. United States*, 747 F.Supp. 967, 1011 (S.D.N.Y.1990) and *Martell v. Boardwalk Enterprises, Inc.*, 748 F.2d 740 (2d Cir.1984) are distinguishable from the instant case because in both of those cases the plaintiff lost only one limb, while in this case Fuentes's left leg has been amputated above the knee, and his right leg is almost completely dysfunctional and may remain so despite corrective surgery. *Poulos v. City of New York*, 99 A.D.2d 709, 472 N.Y.S.2d 3, 4 (1st Dep't 1984), in which the Court reduced to $1,000,000 a pain and suffering award to a 16 year old boy who became a paraplegic due to defendant's negligence, can only give us limited guidance since the Court in that case summarily reduced the plaintiff's award, and did not detail the pain and suffering the plaintiff endured.

Moreover, *Cover v. Cohen*, 92 A.D.2d 928, 460 N.Y.S.2d 350 (2d Dep't 1983), *rev'd on other grounds*, 61 N.Y.2d 261, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984), in which the plaintiff sustained injuries similar to Fuentes's and the Court reduced the plaintiff's damage award to $2,000,000, is not dispositive of the instant case because in *Cover*, the plaintiff was 62 Years old, and the Court made clear that the plaintiff's age was an important factor in reducing his damage award. *Id.* at 352. In the instant case, Fuentes is 31 years of age and thus has many more years of pain and dependency ahead of him than did the plaintiff in *Cover*.

In addition, *Robbins v. United States*, 593 F.Supp. 634 (E.D.Mo.1984), *aff'd*, 767 F.2d 930 (8th Cir.1985), in which the plaintiff, whose left leg was amputated and whose right leg was severely wounded, received a damage award totalling $1,750,-000, is also of limited guidance to us because that case was decided under Missouri law and not New York law, and because the Court in that case did not in any way intimate that a higher damage award would have "shock[ed] the judicial conscience."

Finally, *Warmsley v. City of New York*, 89 A.D.2d 982, 454 N.Y.S.2d 144 (2d Dep't 1982), is also not dispositive of the instant case because in upholding the $2,000,000 damage award in *Warmsley*, the Appellate Division also did not intimate that a higher damage award would have "shocked the judicial conscience."

In sum, Conrail's motion to set aside as excessive Fuentes's pain and suffering award is denied.

### Conclusion

Conrail's motions for a judgment notwithstanding the verdict and for a new trial on the issue of liability are denied. Conrail's motion for remittitur is denied.

SO ORDERED.